**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**WILLIAM CARMAN,**

      **Petitioner,**

**vs.**                                                        **Case No. 4:10cv255-RH/CAS**

**DEPARTMENT OF CORRECTIONS,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

Petitioner William Carman, represented by counsel, filed a 28 U.S.C. § 2254 petition on June 17, 2010. Doc. 1. After direction by this Court, Petitioner filed an amended petition. Doc. 5. In November 2010, Respondent filed a response and then an amended response. Docs. 10 (response) and 11 (amended response). Respondent filed an Unopposed Motion to Seal Exhibits, which the Court granted. Docs. 9 (motion) and 12 (order). Accordingly, the exhibits to the response were filed under seal. *See* Doc. 12. Petitioner filed a reply on February 22, 2011. Doc. 18.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration of all issues raised, the

undersigned has determined that no evidentiary hearing is required for disposition of this matter.  *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.  For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and the § 2254 petition should be denied.

## Relevant Procedural History

By second amended information filed April 27, 2005, in the Second Judicial Circuit, Gadsden County, in case number 04-487-CFA, the State of Florida charged Petitioner Carman with three counts:

> (1) sexual battery on a child under twelve years of age by a defendant eighteen years of age or older, a capital felony, in violation of section 794.011(2)(a), Florida Statutes;
>
> (2) lewd or lascivious molestation of a person less than twelve years of age by a defendant eighteen years of age or older, a first degree felony, in violation of section 800.04(5)(b), Florida Statutes; and
>
> (3) lewd or lascivious molestation of a person twelve years of age or older but less than sixteen years of age by a defendant eighteen years of age or older, a second degree felony, in violation of section 800.04(5)(c)2., Florida Statutes.

Doc. 11 Ex. A at 17-18.  Count 1 involved victim S.M., and Counts 2 and 3 involved victim G.C.  *Id*.; *see id.* Ex. F 511-12.  Carman proceeded to trial, during which he testified.  *Id*. Ex. F at 396.  On August 19, 2005, the jury found him guilty as charged on Count 1 and guilty of the lesser included offense of battery on both Counts 2 and 3.  *Id*. Ex. A at 47-49, Ex. F at 511-12.  Carman filed a motion for a new trial, which was denied after a hearing.  *Id*. Ex. A at 50-53, 61; Ex. G.

On September 23, 2005, the trial court adjudicated Carman guilty and sentenced

him to life without parole on Count 1, and 95 days on each of the other two counts.  *Id*.

at 63-70.  The court later corrected the sentence, on May 8, 2006, to allow the

possibility of parole on Count 1.  *Id*. Ex. B at 100, 104, 110.

Carman appealed his judgment and sentence to the First District Court of Appeal

(DCA), assigned case number 1D05-4669.  *See* Doc. 11 Ex. H.  Carman raised seven

points on appeal:

> (1) The trial court erred by failing to order a competency evaluation because there were "reasonable grounds" to believe that Carman was not competent to proceed at the beginning of the trial.
>
> (2) The trial court erred by permitting the State to introduce the prior consistent written statement of witness S.M.
>
> (3) The trial court erred by preventing Carman from introducing evidence that other girls had similar contact with Carman and had not been molested by Carman.
>
> (4) The trial court erred by denying Carman's motion to strike the testimony of witness Mireille Mackey based on the witness's violation of the rule of sequestration of witnesses.
>
> (5) The trial court erred by permitting the State to introduce improper hearsay testimony.
>
> (6) Prosecutorial misconduct occurred during the State's closing argument, resulting in fundamental error.
>
> (7) The evidence was insufficient to support the convictions for the lesser-included offense of battery (as well as the charged offense) for alleged victim G.C.

*Id*. at ii-iv.  The State filed an Answer Brief and Carman filed a Reply Brief.  *See* Doc.

11 Exs. I (Answer Brief) and J (Reply Brief).  The First DCA affirmed the case without

an opinion on March 9, 2007.  *Id*. Ex. K; *see* <u>Carman v. State</u>, 954 So. 2d 1158 (Fla. 1st

DCA 2007) (table).  Carman filed a motion for rehearing and/or a motion for issuance of

a written opinion.  Doc. 11 Ex. L.  The First DCA denied both motions by order on April

19, 2007.  *See* online docket for case number 1D05-4669 at <u>www.1dca.org.</u>  The

mandate issued May 7, 2007.  Doc. 11 Ex. M.

On May 2, 2008, Carman, represented by counsel, filed a motion for post-

conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 in the state circuit

court.  Doc. 11 Ex. N at 1-29.  Carman raised seven grounds – one alleging new

evidence and six alleging ineffective assistance of counsel (IAC):

> (1) Carman should be granted a new trial based on the discovery of new evidence.  *Id*. at 4-7.

> (2) Carman's convictions should be vacated because he was provided IAC where his trial attorney failed to seek a severance of the charges against the two different victims.  *Id*. at 7-14.

> (3) Carman was provided IAC because his trial counsel failed to raise the appropriate objection to the introduction of the hearsay statements of S.M.  *Id*. at 14-18.

> (4) Carman was provided IAC because his trial counsel failed to properly object to the inappropriate conduct of the prosecutor during opening statements, on cross-examination, and during closing argument.  *Id*. at 18-21.

> (5) Carman was provided IAC because his trial counsel failed to object to the prosecutor's improper emphasis of a racial epithet Carman allegedly used to describe one of the alleged victims.  *Id*. at 21-23.

> (6) Carman was provided IAC because his trial attorney failed to request a competency examination prior to the commencement of the trial.  *Id*. at 23-26.

(7) The cumulative errors of trial counsel in this case deprived Carman of his right to the effective assistance of counsel and his right to a fair trial. *Id*. at 26-27.

The state post-conviction trial court directed the State to file a response to the Rule 3.850 motion, *id*. at 30-31, which the State filed on June 27, 2008, *id*. at 32-35. The State indicated an evidentiary hearing was needed for the first ground only, and the remaining grounds should be summarily denied. *Id*. Carman filed a reply on July 25, 2008. *Id*. at 36-40.

The state post-conviction trial court ordered an evidentiary hearing on the first ground. *Id*. at 50. The court determined that the remaining claims "either are conclusively rebutted by the record or are not legally sufficient. *Id*. Carman filed a motion for rehearing. *Id*. at 55-58. The court entered an order striking the motion for rehearing as unauthorized, because it was directed to a non-final order. *Id*. at 60.

The evidentiary hearing took place on December 1, 2008. Doc. 11 Ex. P (transcript). On February 1, 2009, Carman, through counsel, filed a Memorandum of Law in Support of Motion for Postconviction Relief. Doc. 11 Ex. N at 61-72. The State filed a response to this memorandum. *Id*. at 80-82. Carman filed a reply. *Id*. at 88-90.

In an order rendered June 18, 2009, the state post-conviction trial court denied Carman's Rule 3.850 motion. Doc. 11 Ex. O at 91-96. A successor judge entered this order, reviewing and denying all grounds raised. *Id*.

Carman, through counsel, appealed the denial of his Rule 3.850 motion to the First DCA and filed a brief, in case number 1D09-4878. Doc. 11 Ex. Q. The State did not file an answer brief. *Id.* Ex. R. The First DCA per curiam affirmed the case without

an opinion on February 23, 2010. *Id*. Ex. S; *see* <u>Carman v. State</u>, 32 So. 3d 624 (Fla.

1st DCA 2010) (table). Carman filed a motion for rehearing and written opinion, which

the First DCA denied. Doc. 11 Exs. T, U. The mandate issued on April 22, 2010. Doc.

11 Ex. V; online docket for 1D09-4878 at <u>www.1dca.org.</u>

As indicated above, on June 17, 2010, Carman, through counsel, filed a § 2254

petition in this Court. Doc. 1. After direction by this Court, Carman filed an amended

petition. Doc. 5. Respondent filed a response and then an amended response, with

exhibits which have been sealed. Docs. 9-12. Carman has filed a reply. Doc. 18.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for

persons in state custody. In pertinent part, § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law" refers to "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court renders its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003). "A

state court decision is 'contrary to' clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court decision constitutes an "unreasonable application" of clearly established federal law if it: (1) "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case," or (2) "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Id*.

In this case, in his amended § 2254 petition, Carman raises seven grounds. Doc. 5. As explained in detail below, none of these grounds warrant federal habeas corpus relief.

### Ground 1: Proceeding to Trial Without Competency Examination

In Ground 1, Carman asserts he was denied his constitutional rights to be present at trial, to confront the witnesses against him, and due process, when the state court had his trial without first conducting a competency examination. Doc. 5 at 8. Carman asserts that the evidence presented to the state trial court showed that, on the morning his trial started, Carman was under the influence of medication he had taken the night before and he was not able to effectively follow or assist his attorney during the trial proceedings. *Id*. at 9. Carman asserts evidence showed he was making faces at the jury during the State's opening statement. *Id*.

Carman further asserts that, at the hearing on his motion for a new trial, he introduced substantial evidence establishing he had overdosed on his medication the night before the trial started, in an effort to commit suicide. *Id*. He presented several witnesses in support of his allegation of diminished mental condition on that date, including Dr. Darren Rothschild, a forensic psychiatrist, who testified that, in his opinion, Carman was not competent on the first day of trial. *Id*. at 10.

Carman indicates that, in denying his motion for a new trial, the state trial court concluded that, even if Carman was incompetent, he was not prejudiced because he had previously taken the depositions of S.M. and G.C., both of whom testified on the first day of trial. *Id*. Carman asserts the court erred in this reasoning, which is inconsistent with decisions of the U.S. Supreme Court, including Crawford v. Washington, 541 U.S. 36 (2004), and the Florida Supreme Court's decision in Lopez v. State, 974 So. 2d 340 (Fla. 2008). Doc. 5 at 10.

Respondent argues that Carman is asking this Court to attribute evidence presented post-trial, as grounds for a new trial, to the state trial court's pre-trial ruing not to conduct a competency hearing. Doc. 11 at 4. During the trial court's pre-trial inquiry, Carman admitted only to taking one pill, for nerves, at midnight. *Id*. Thus, in relying on evidence adduced at the hearing on the motion for a new trial, that Carman attempted suicide by taking an overdose, Carman relies on a factual basis not fairly presented to the trial court at the time his counsel requested a continuance – a circumstance the State argued in its Answer Brief in Carman's direct appeal. *Id*.; *see* Doc. 11 Ex. I at 28-32.

Respondent further argues that the state trial court's denial of a new trial, which Carman asserts constituted an unreasonable application of U.S. Supreme Court decisions, was not raised on direct appeal and, therefore, is not an exhausted claim. Doc. 11 at 5. The issue was always raised as one of alleged trial court error due to the failure to order a competency evaluation. *Id*.; *see* Doc. 11 Ex. H at ii, 14-32; Ex. J at 1-10. If Carman is now arguing the state trial court violated due process by denying a new trial, he has failed to exhaust this claim. Doc. 11 at 5; *see, e.g.*, Thompson v. Sec'y, Dep't of Corr., 517 F.3d 1279, 1283 (11th Cir. 2008). Carman has had a direct appeal and cannot now return to state court to exhaust this claim; therefore, it is procedurally barred. Doc. 11 at 5-6; *see, e.g.*, Teague v. Lane, 489 U.S. 288, 299 (1989).

In addition, Respondent argues that when Carman's counsel first raised the issue of Carman's condition, counsel requested a continuance and did not raise or suggest a constitutional claim. Doc. 11 at 6. At no time did counsel ask for a competency evaluation or indicate that Carman actually took more medication than the one antidepressant pill he had indicated to the judge. *Id*. at 7. The state trial court denied the request for a continuance, explaining its decision. *Id*.; *see* Doc. 11 Ex. D at 14-15. Respondent argues that, read fairly, the trial court was asked only to make a factual determination based chiefly on the court's observations of Carman and vague representations by defense counsel. Doc. 11 at 8. The only ruling was a denial of a continuance. *Id*. Respondent argues the trial court was not alerted to any federal claim

when Carman's counsel sought the continuance, and Carman cannot show timely and fair presentation of a federal claim on this ground. *Id*. at 8-9.

On the merits, Respondent argues Carman does not assert the trial court unreasonably determined the facts, before or after trial, in light of the evidence presented. Doc. 11 at 9. Thus, even assuming this ground is considered, Carman has not shown a basis for habeas relief. *Id*.; *see* 28 U.S.C. 2254(d)(2).

Respondent further argues, by the same logic, the denial of a continuance did not constitute an unreasonable application of clearly established federal law. Doc. 11 at 9-13. Respondent argues "the events of trial also failed to raise a bona fide doubt as to his competency to proceed." *Id*. at 10. At the time Carman's counsel sought a continuance, no federal law was mentioned. *Id*. at 13. The trial court inquired into Carman's ability to proceed and the court's factual findings are reasonable and supported by the record. *Id*. The court's denial of a continuance and lack of sua sponte competency hearing are entitled to AEDPA deference. *Id*.

In reply, Carman argues the Respondent minimizes the facts known to the trial judge at the beginning of Carman's trial. Doc. 18 at 1. In addition to the facts acknowledged by the Respondent, there was evidence that Carman was making faces at the jury during the prosecutor's opening statement. *Id.*; *see* Ex. D at 67.

Carman further asserts that Respondent incorrectly contends the trial court's denial of Carman's motion for a new trial was not exhausted. *Id.* at 2. Carman explicitly argued in his initial brief on direct appeal that the trial court erred in denying his motion for a new trial based on his lack of competency. *Id.*; *see* Ex. H at 23.

In this ground, Carman essentially argues that trial court erred by not ordering a competency hearing before proceeding with the trial and thus deprived him of his constitutional right to a fair trial. *See* Doc. 5 at 9. Carman cites to <u>Pate v. Robinson</u>, 383 U.S. 375 (1966), as he did in his Initial Brief in his direct appeal. *Id.*; *see* Doc. 11 Ex. H at 23. As Respondent indicates, to the extent this, and not the trial court's denial of the motion for a new trial, is the focus of Carman's claim, such was raised as a point on direct appeal from his judgment and sentence and, therefore, properly exhausted. *See* Doc. 11 Ex. H at ii, 14-32. As Respondent further indicates, at no time before or during the trial, did defense counsel request a competency hearing or evaluation. Defense counsel requested a continuance, which the trial court denied, explaining its decision. *See* Doc. 11 at 7; Ex. D at 14-15. Even at this point, defense counsel did not raise the issue of a federal constitutional question to the state trial court – though federal case law was cited in Carman's Initial Brief in his direct appeal. Accordingly, Carman, at least arguably, satisfied the "fair presentation" requirement necessary for raising this ground in a federal habeas proceeding. *See, e.g.*, <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) ("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'").

Reaching the merits, the Court should deny Carman's claim. Carman has raised a procedural competency claim, a <u>Pate</u> claim. *See* <u>Lawrence v. Sec'y, Fla. Dep't of Corr.</u>, 700 F.3d 464, 481 n.5 (11th Cir. 2012). A defendant is competent to stand trial if

he possesses (1) sufficient present ability to consult with his attorney with a reasonable

degree of rational understanding, and (2) a rational and factual understanding of the

proceedings against him." Pardo v. Sec'y, Fla. Dep't of Corr., 587 F.3d 1093, 1100

(citing Dusky v. United States, 362 U.S. 402 (1960))  "A trial judge must conduct a sua

sponte sanity hearing if the defendant's conduct and the evidence raises a 'bona fide

doubt' regarding the defendant's competence to stand trial." Id. at 1099-1100 (quoting

Pate, 383 U.S. at 385-86).

The state court record reflects that, just before the start of the trial, defense

counsel requested a side bar during which the following transpired:

> MR. SMITH [defense counsel]: Judge, this morning my client came in and his family approached me and told me that he was seeing double and could not wake up and is not acting himself.
>
> I inquired.  He has taken some prescription medication.  I've met him in my office a hundred times.  He's not the Bill Carman I know this morning.  I had asked him at some point in the past to wean himself off of this nerve medication that he's been taking.
>
> He couldn't sleep last night.  He took one after midnight, and I need to let the Court know that, because obviously this is a case of great importance.  And if for some reason at a later point in time, because the whole family knows about it and he knows about it, they were to turn around and say I didn't bring it to your attention because he might not assist me properly in his defense, I need to let everybody know right now so we don't go any further if there's a problem with that.
>
> THE COURT: Okay.  Well now, I don't know him, I only saw him in court the other day, but he seems to be okay to me, just looking at him.  And the questions that I just asked him, he seemed to be okay.  I guess, I mean you're not asking for a continuance, are you?
>
> MR. SMITH: Judge, I'm not sure what I'm doing because I've never been in this position, first of all.  But I had to hold him up in the street when I talked to him about this.

His sister, who knows him very well, was the first person to bring it to my attention.  My investigator, who also knows him, has noticed that his heart is racing, although he looks fairly composed on the outside.  And he's not responding to me the way I feel like he should be.

THE COURT: Mr. Combs [the prosecutor]?

MR. COMBS: Judge, I think, you know, you probably need to make an inquiry of him.  His response to the questions here, obviously showed that he could understand your questions and could make an intelligent response.[1]

So I think just to cover the record, you probably have to make an inquiry of him and ask him what is he taking.  We don't even know what it is.

MR. SMITH: I want him to tell you that.

THE COURT: Mr. Carman, I'll just ask you if you will come forward, please.

(THEREUPON, THE DEFENDANT APPROACHED THE BENCH)

THE COURT: You can just stand right there, Mr. Carman.  I just need to ask you a couple of questions.  How are you feeling today?  I mean, I understand you're here on a trial, and it's a significant trial and so everybody would be nervous, but, I mean, how are you feeling today?

THE DEFENDANT: Today, I'm kind of groggy, a little bit groggy.

THE COURT: Can you hear all right?  Are you hearing me all right?

THE DEFENDANT: Yes, I can hear.

THE COURT: Okay.  The questions I just asked you about the severance motion, did you understand those questions okay?

---

[1]This refers to an inquiry just preceding this quoted portion of the transcript, in which defense counsel indicated he was not pursuing a motion to sever and the trial judge asked whether this was a matter of strategy, and further asked whether Carman agreed.  This portion of the transcript is quoted *infra*, in the discussion and analysis of Ground 3.

Case No. 4:10cv255-RH/CAS

THE DEFENDANT: Yes, sir.

. . . .[2]

THE COURT: . . . But now have you taken any medication today?

THE DEFENDANT: Today, no.  Not this morning.  This was earlier.

THE COURT: So none since you woke up this morning?

THE DEFENDANT: Not since I woke up, no.

THE COURT: Okay.  Did you take some like last night?

THE DEFENDANT: Yeah, about midnight.

THE COURT: Okay.  What type of medicine are you taking?

THE DEFENDANT: It's like an antidepressant.  It helps you sleep.

THE COURT: Right.  What is it?  What is the medicine?  What is the dosage?

THE DEFENDANT: I'm not sure, sir.  It's small pills, about that size.

THE COURT: Okay.  Which doctor?

THE DEFENDANT: Dr. Whiddon.

THE COURT: Dr. Whiddon prescribed these for you?

THE DEFENDANT: Yes.

THE COURT: Have you been taking them for awhile now?

THE DEFENDANT: Just off and on when there's anxiety.  I don't take them all the time.

THE COURT: Okay.  So you don't take them all the time?

---

[2]This omitted portion concerns the motion to sever and is quoted *infra*, in the discussion and analysis of Ground 3.

THE DEFENDANT: No.

THE COURT: But like, for instance, did you take them the other day for jury selection?

THE DEFENDANT: Actually, I didn't take them before then, no.

THE COURT: Okay. But in other words, if you get anxious or worried or nervous or something, you take them and they tend to calm you down?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do they affect how you think?

THE DEFENDANT: Normally, no.

THE COURT: All right. In other words, if – I don't know if you do cross word puzzles, but if you were to do a cross word puzzle now, could you do one?

THE DEFENDANT: Yeah. It might take me a little longer, but I can do it.

THE COURT: All right. I need to make sure that you're able to assist Mr. Smith. So if at any time you – because it's important. You know, I mean, obviously this is your case and Mr. Smith is the lawyer, but he needs to, you know, have your input on certain things with witnesses and what they say or, you know, what they might not say.

THE DEFENDANT: Uh-huh.

THE COURT: So this is what I want you to do. Do you have any more of the medicine with you?

THE DEFENDANT: No.

THE COURT: Okay. Well, the –

THE DEFENDANT: In fact, I don't have any more at all now.

THE COURT: Okay. So you took the last one last night?

THE DEFENDANT: This is over with.

THE COURT: Okay. Well, then this is what I want you to assure me, that if you need a break, you tell Mr. Smith and we'll take a break.

THE DEFENDANT: Okay.

THE COURT: Okay. Or if things start going too fast, you stop and you tell Mr. Smith and we'll take a break.

THE DEFENDANT: Yes, sir.

THE COURT: Because you need to know what's going on here today and you need to be able to help him.

THE DEFENDANT: Yes, sir.

THE COURT: I mean, he's a fine lawyer but, you know, this is kind of a team thing.

THE DEFENDANT: Right.

THE COURT: For you. And so will you just promise me that if you get confused or something that you'll stop and tell Mr. Smith, and we'll take a recess, we'll take a break if that's necessary. Okay?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

MR. SMITH: Your Honor, may I have a moment with Mr. Carman just to go over a few things with him about what I'm going to need him to do with me this morning?

THE COURT: Sure.

MR. SMITH: I know that you need to be comfortable with him, but I want you to be comfortable with how I'm comfortable with him.

THE COURT: Well, I understand that, but, I mean, the – let me just say this. And this is for Mr. Carman's benefits. Obviously, if you're on trial for anything, but including something like this, it's a very nerve racking experience.

THE DEFENDANT: Yes, it is.

THE COURT: It would be for anybody, you know, that has got half a brain. I don't think it's in your best interest to try to postpone this, because if we postpone two weeks we're still going to have the same problem today, only it's going to be worse.

So, I mean, yes, you can talk to him, if you wish to. . . . If you want to talk to him, go ahead.

MR. SMITH: Yes, sir.  Thank you.

THE COURT: You can just step back, if you want.

(BRIEF PAUSE OFF THE RECORD)

MR. SMITH: Your Honor, may I have one moment with a family member?

THE COURT: Sure.

MR. SMITH: I apologize for the delay, but I want to make sure what I'm doing.

THE COURT: That's all right.  Go ahead.

(BRIEF PAUSE OFF THE RECORD)

MR. SMITH: Your Honor, based on my personal observations, my conversation with my client, William Carman, and conversations with his sister, Deborah Green, I am moving for a continuance.  I do not believe that he can assist me today.

THE COURT: All right.  Mr. Combs?

Mr. COMBS: Judge, I believe the Court has made an inquiry of Mr. Carman, and in my observation of him at the bench, while he may be a little wobbly on his pins, we're not here for some athletic endeavor.  And he was able to understand all the questions that the Court gave, make intelligent, rational responses, and I think the motion should be denied.

THE COURT: All right.  I'm going to deny the motion for a continuance. Let me be clear why.  I've had a fairly extensive colloquy with Mr. Carman, and I'm convinced that he understands what's going on.  I understand he took some medication last night that's prescription mediation that he takes for nerves and so forth.

And as I indicated to him, I mean, if I was sitting in his chair I would feel the same way. I've also indicated that – or I'll make the ruling that I think he is competent to go forward today, and that's the test is competency.

And I've also indicated to Mr. Carman and his attorney if he – if things are starting to go too fast for him, or he is confused as to what's going on, that he needs to tell Mr. Smith, and Mr. Smith can ask me and I will – we'll take a recess to make sure that he's able to assist his lawyer. Now, I know that he and his lawyer have had a lot of conversations about his case, prepared the defense and so forth and so on, but it's still important that Mr. Carman be able to assist his attorney during the course of the trial, and I want to make sure that that occurs.

The situation will be no better in two weeks or four weeks. It could be a lot worse for Mr. Carman. So, if it takes us a little longer to try the case, that's fine. I want to make sure he understands what's going on and he's able to help his lawyer.

So Mr. Carman, you promised me that if things got out of hand, as far as your ability to keep up with things, you will tell your lawyer to stop the trial; correct?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Well, that's fine. I think you'll be all right. And probably as the day goes on, and this medication that you took last night – I think you said you took it around midnight – wears off, you will probably feel better and better.

The first hour or so is going to be taken with preliminary instructions and opening statements, so the first witness is probably not going to be called for about an hour. And that, I think, will assist you in getting your sea legs under you, as we call it in the Navy.

Doc. 11 Ex. D at 5-15. Opening statements were given and, around 11 a.m., the

prosecutor pointed out that Carman was making gestures to the jury:

MR. COMBS: Well, judge, one issue I want to raise is, I was informed during the course of my opening that the defendant was making gestures to the jury in reaction to things, and I think that's inappropriate, and I

would ask him to be admonished.  That trying to communicate with the
jury by nodding of heads and making gestures –

THE COURT: Well, I don't think anybody – I think it's counter productive
for anybody to do that.  So I'll just admonish everyone not to do that.

*Id*. at 67.  Thereafter, the first witness, S.M., was called at approximately 11:15 a.m.  *Id*.

At the end of the first day of trial, the State rested.  *Id*. at 323, 360.  After the jury

was excused for the day, the judge asked defense counsel whether Mr. Carman was

going to testify and defense counsel replied, "I anticipate that he would, Judge."  *Id*. at

323.  The judge then stated:

THE COURT: Okay.  And that's fine, I just want to ask him some
questions while we're here now.  Mr. Carman, by the way, I do – I did pay
close attention to Mr. Carman, especially this morning, and I notice he
was making notes and so forth during the course of the trial so it seems
that he has been able to help you.  Are you feeling better now, Mr.
Carman?

THE DEFENDANT: Yes, sir.

THE COURT: I assume you are.  And I'm glad that we were able to go
forward with the case today for everyone's benefit, including yours.

*Id*. at 323-24.  The judge then advised Carman that he had the right to testify and the

right not to testify, and it was his decision.  *Id*. at 324-26.

Carman did testify at his trial, on the second day.  *Id*. Ex. F at 396-412.  Review

of that testimony does not indicate any issue as to his competency.  *See id.*

As demonstrated by the above excerpts from the trial transcript, Carman's trial

counsel did not specifically request a competency hearing and only requested a

continuance.  The trial judge did not abuse his discretion in denying the request for a

continuance.

Further, the trial judge inquired of Carman and implicitly, if not explicitly, found no reasonable grounds to suggest Carman was not competent or a bona fide doubt necessitating a competency hearing. The record supports this determination. Defense counsel did not request a competency hearing or evaluation. Other than the record discussion just prior to the start of trial, nothing indicates a question about whether Carman was able to assist in his defense; in fact, the trial judge noted at the end of the first day of trial, that Carman had been "making notes and so forth" during the trial and it seemed that Carman was assisting defense counsel. Other than Carman making faces at the jury at the start of the trial, nothing on the record reflects irrational behavior by him during the remainder of the proceedings, including his own testimony. Therefore, the trial court did not err in failing to sua sponte order a competency evaluation. *See* Fla. R. Crim. P. 3.210; Petrena v. State, 914 So. 2d 999 (Fla. 1st DCA 2005) (affirming conviction and finding evidence insufficient to establish defendant was mentally incompetent to stand trial, explaining, in part, that trial judge "noted aloud that Appellant appeared to be alert and had answered the court's questions 'in a responsive manner,'" trial court denied defense counsel's motion for continuance, and defense counsel never requested relief under Florida Rule of Criminal Procedure 3.210(b), and concluding "no 'reasonable ground' was presented so as to require the trial court to order a mental competency evaluation and hearing under Rule 3.210(b), and that Appellant has not shown any prejudice resulting from the court's failure *sua sponte* to appoint experts and order an evaluation and hearing"). *See also* Drope v. Missouri, 420 U.S. 162, 180 (1975) (explaining relevant information concerning defendant's competence may

include evidence of defendant's irrational behavior, demeanor at trial, or prior medical opinion, but "[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed"); Watts v. Singletary, 87 F.3d 1282, 1287-88 (11th Cir. 1996) (reversing grant of habeas corpus relief under Pate and explaining, in part, "even had Watts admitted in open court that he could not stay awake at trial because he was up all night smoking crack, this would not necessarily be sufficient to require a Pate hearing" and further explaining that "[t]he fact that a defendant is taking drugs (whether proscribed or prescribed) during trial should alert the court to a potential competence issue, but need not, in itself, necessitate a competency hearing" as "[o]ther information may convince the court that a formal hearing is not necessary to be reasonably certain that the defendant has the requisite capacity to understand what is going on around him and to communicate with his lawyer"); Fallada v. Dugger, 819 F.2d 1564, 1568-69 (11th Cir. 1987) (explaining that Pate analysis must focus on "what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency" and noting defendant's use of prescription drugs does not, per se, necessitate competency hearing but is "merely a relevant factor").

As indicated above, Carman had raised the Pate claim has his first point on appeal and the First DCA affirmed that appeal without an opinion. Although the First DCA provided no guidance or rationale for its rejection of Carman's claim, under the "contrary to" prong of § 2254(d)(1), the state court need not cite federal law "so long as neither the reasoning nor the result of the state-court decision contradicts" U.S.

Supreme Court precedent. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). The state appellate

court's affirmance warrants "deference under AEDPA because 'the summary nature of

a state court's decision does not lessen the deference that it is due.'" <u>Gill v. Mecusker</u>,

633 F.3d 1272, 1288 (11th Cir. 2011) (quoting <u>Wright v. Moore</u>, 278 F.3d 1245, 1254

(11th Cir. 2002)); *see* <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784-85 (2011) ("When a

federal claim has been presented to a state court and the state court has denied relief,

it may be presumed that the state court adjudicated the claim on the merits in the

absence of any indication or state-law procedural principles to the contrary."). In light of

the above analysis of the state court record, Carman has failed to demonstrate the

state court's rejection of this claim relied upon an unreasonable determination of the

facts or constituted an unreasonable application of clearly established federal law.

Accordingly, this ground should be denied.

Carman's remaining grounds all allege ineffective assistance of counsel (IAC).

In <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), the U.S. Supreme Court

adopted a two-part test for claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that
> counsel's errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

To demonstrate ineffectiveness, a "defendant must show that counsel's performance

fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate

prejudice, a defendant "must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the <u>Strickland</u> standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quoting <u>Schiro v. Landrigan</u>, 550 U.S. 465, 473 (2007)). "And, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* It is a "doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard." *Id.*

<u>Ground 2: IAC – Failure to Request Competency Examination Prior to Trial</u>

In Ground 2, Carman asserts IAC to the extent his trial counsel failed to specifically request a competency hearing before his trial started. Doc. 5 at 11. Carman claims prejudice by his counsel's deficient conduct because he proceeded to trial when he was not competent. *Id.* Carman argues his counsel had a continuing duty, pursuant to Florida Rule of Criminal Procedure 3.210, to raise the issue of Carman's competency at any material stage of the proceeding. *Id.* Carman asserts that, because the trial would not have commenced if a competency examination had occurred, there is a reasonable probability that the outcome of the proceeding would have been different if counsel had made the proper motion. *Id.* at 12.

Carman further argues that the record does not support the state post-conviction trial court's conclusion that this issue was properly preserved for appellate review, nor is that conclusion supported by any legal authority suggesting that a motion for a continuance is equivalent to a motion seeking a competency determination. *Id*. Carman argues the state post-conviction trial court's decision to deny this claim constituted an unreasonable application of Strickland.

Respondent argues the post-conviction trial court's rulings denying relief and the First DCA's affirmance thereof are entitled to AEDPA deference. Doc. 11 at 14. Respondent argues this ground has a logical flaw in that it overlooks what Carman's trial counsel and the trial court actually did. *Id*. By questioning Carman's ability to provide assistance and then moving for a continuance, defense counsel compelled a preliminary inquiry by the trial court. *Id*. at 15. After this inquiry, the trial court denied a continuance, implicitly concluding there was no showing of a bona fide doubt about Carman's competency. Respondent asserts, "Under the same facts and logic, there was no justification for a competency 'examination.'" *Id*. Given the limited information Carman provided to defense counsel before trial and Carman's apparent ability to respond to the trial court's inquiry, there was no factual basis to request further inquiry into Carman's competency. *Id*. Accordingly, there was no deficient performance. As to prejudice, Respondent adopts the post-conviction trial court's order denying relief. *Id*.; *see* Doc. 11 Ex. O at 94-95.

In reply, Carman relies on his reply to Ground 1 as well as his assertions in his petition. Doc. 18 at 3. Carman argues that information establishes that he was

prejudiced by defense counsel's failure to request a competency hearing prior to trial

and Carman proceeded to trial when he was not competent to do so. *Id.*

In denying this claim, the state post-conviction trial court made the following

findings:

> 11.   Defendant claims counsel was ineffective for failing to move for a competency exam.   There is no way an "expert competency exam" could take place without continuing the trial.   Defense counsel moved for a continuance on the grounds his client could not assist him.   He based this motion on his prior experience with Defendant, the family's input, his observations at trial, the taking of time to speak privately with Defendant. (Trial Tr. 5-13) The issue in this case was one of Defendant being temporarily ill, and if so, how ill and why.   If the judge abused his discretion in denying the continuance, then this was a proper matter for direct appeal.   Notably, this is not a claim of mental illness or mental retardation under Rule 3.210, 3.211, or 3.212.   Defendant responded very well to the lengthy colloquy by the judge.   The judge obtained a promise from Defendant that he would tell his attorney to stop the trial at any time if he had problems.   (Tr. 15).   To further "preserve" the issue, counsel filed a motion for new trial, alleging incompetency at the time of trial.   There was a substantial hearing.   (Motion to Dismiss, etc. 9/23/05, tr. 1-56) The trial judge gave a detailed ruling denying the motion.   In essence, he found Defendant was competent at trial because of his colloquy before opening statements and his observations of how the trial actually proceeded.   The trial judge added that if Defendant wasn't "with it" at the outset of the trial, *there was no prejudice and he thoroughly explained why he found this*.   (Tr. 52-56, esp. 55) In summary, Defense counsel did everything reasonable to preserve any trial issue based on the Defendant being unable to assist him at trial.   The judge ruled on the merits of the claim.   His rulings were directly appealable.   Moreover, if there was a failure to properly preserve the motion to continue, then on a 3.850, prejudice must be shown which undermines the verdict.   It is not enough that the case would have been reversed on appeal if the objection had been preserved.   The standard for setting aside a conviction for 3.850 ineffective assistance of counsel is a higher standard than for relief on direct appeal.   **Thompson v. State**, 990 So. 2d 482 (Fla. 2008).

Doc. 11 Ex. O at 94-95.   As Respondent urges, this ruling, affirmed on appeal without

opinion, is entitled to AEDPA deference.

As indicated in the analysis of Ground 1, *supra*, defense counsel did inform the trial court of Carman's condition on the morning the trial started. Specifically, defense counsel stated that Carman "was seeing double and could not wake up and is not acting himself." Upon questioning by the trial judge, Carman indicated he was "a little bit groggy," he had taken one pill at midnight, and such medication was prescribed for him by a doctor. The trial judge stated, before his inquiry, that Carman "looks okay" and, after the inquiry, the judge was "convinced that he [Carman] understands what's going on." The judge acknowledged the importance of Carman being able to assist defense counsel and obtained assurances from Carman that if he felt unable to follow the proceedings, he should tell his attorney and the judge would allow a break. Defense counsel also requested a continuance, which the trial court denied. In these circumstances, defense counsel's failure to request a competency hearing does not appear unreasonable. Further, Carman has not shown a reasonable probability such request would have been granted, had it been made. Indeed, it appears more likely that such a request, if made, would have been denied, given the trial judge's inquiry and implicit, if not explicit, determination that no bona fide issue existed concerning Carman's competency.

Given this record, Carman has failed to establish the state court's decision denying this IAC claim was based on an unreasonable determination of the facts or an unreasonable application of Strickland. This ground should be denied.

<u>Ground 3:  IAC – Failure to Seek Severance</u>

In Ground 3, Carman argues he had IAC because his trial counsel failed to seek a severance of the charges involving S.M. from the charges involving G.C.  Doc. 5 at 12.  He argues the record does not support the state courts' conclusion that counsel's decision not to pursue the motion to sever was a reasonable strategy, and this conclusion was inappropriate prior to conducting an evidentiary hearing.  *Id*.  He argues the state courts' decisions to deny this claim constituted an unreasonable application of <u>Strickland</u>.

Carman asserts the state trial court's reliance on a discussion that took place just prior to the trial, as a basis to summarily deny Carman's claim, was objectively unreasonable.  Doc. 5 at 13.  Carman asserts this short discussion did not constitute a sufficient substitution for a full evidentiary hearing on the issue and did not establish that defense counsel's decision not to pursue severance was objectively reasonable under the circumstances.  Doc. 5 at 13.  Carman argues he should get an evidentiary hearing on this issue.  *Id*. at 15.

Carman further asserts that, based on Florida case law on the admissibility of Williams Rule evidence and evidence that is inextricably intertwined, "a thorough investigation of law and facts would have lead a reasonably competent lawyer to the conclusion that a severance was the appropriate course of action."  *Id*.  That defense counsel may have made the decision for strategic reasons does not establish that it was objectively reasonable or that it did not constitute ineffective assistance.  *Id*.  Carman argues that a review of applicable Florida case law, repeatedly cited to the trial

court, establishes that the trial court would have been required to grant a severance

and that evidence regarding the two different alleged victims would not have been

admissible at separate trials. *Id*. at 13-15. Carman asserts that defense counsel's

failure to seek a severance of the charges was extremely prejudicial because it resulted

in evidence concerning one victim to bolster allegations concerning the other. *Id*. at 16.

The prejudice was heightened in this case because the offenses are similar and

because there was no real corroboration for the testimony of either victim. *Id*.

Respondent asserts that, other than a single cite to Strickland, Carman's entire

argument on this ground rests on state law. Doc. 11 at 15. Carman claims state law

required severance under the facts and the result would have been different. *Id*. at 15-

16. As the post-conviction court noted, this was a "strong case," with "too many

obstacles to overcome for the defense." *Id*. at 16; Ex. O at 96. Any deficient

performance from failure to pursue the severance motion was not prejudicial. Doc. 11

at 16.

Respondent relies on the post-conviction trial court's facts and rationale in

denying this ground. Doc. 11 at 16; Ex. O at 92-93. Carman's trial counsel made a

reasonable strategic decision not to pursue the severance motion, which had been

filed. Doc. 11 at 16. These types of decisions cannot be the basis for habeas relief.

*Id*.; *see, e.g.*, Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc)

("We cannot, and will not, second guess the strategic decisions trial counsel are called

upon to make.").

In reply, Carman asserts Respondent continues to ignore the fact that no

evidentiary hearing was conducted on this claim.  Doc. 18 at 3.  Carman asserts such a

hearing must take place before a court can properly conclude trial counsel's decision

was a matter of strategy.  *Id.*; *see* Porter v. Wainwright, 805 F.3d 930, 935 (11th Cir.

1986).  Even if it was a strategic decision, this Court must separately review whether

that decision was reasonable.  Doc. 18 at 3; *see* Dingle v. Dep't of Corr., 480 F.3d

1092, 1099 (11th Cir. 2007).  Carman asserts the specific facts of his case and

applicable Florida law on severance establish that defense counsel should have sought

a severance and the failure to do so constituted IAC.  Doc. 18 at 3.

In denying this claim, the state post-conviction trial court made the following

findings:

> 5.  The record in this case conclusively shows that a motion to
> sever was actually made by defense counsel prior to trial, and that there
> was a strategical *choice* to not pursue it, and the client *agreed*.  (Trial tr. 3-
> 8)

> 6.  The risks of "no severance" are very obvious to any experienced
> criminal attorney and judge.  Had the counts been severed, the Court may
> have allowed all evidence in regarding the two child sex abuse victims as
> Williams rule, anyway.  Cases on appeal on Williams rule are very case
> specific.  Therefore, the Williams rule issue was a real risk, if not a certain
> one by the trial judge.  No good lawyer takes risks based on what he
> hopes an appellate court will say.  Also, the state's case as to the girls
> was intertwined because to disprove a fabrication, the state had to show
> the way the abuse was reported.  Essentially, [G.C.] told some little girl
> friends about herself, the little girls talked when [G.C.] was gone, one
> mother overheard the girls reference to [G.C.] and "rape," the mother calls
> the Abuse Hotline, DCF shows up at Maria Day's house, who is the
> mother of [G.C.] and [S.M.] who is then 17, [G.C.] adamantly denies she
> was raped or touched in a bad way; [S.M.] returns home surprised to see
> DCF, [S.M.] cries and reveals for the first time her sexual abuse, upset
> that [G.C.] may have been also abused. [S.M.] details the abuse to her as

a young child, when her mother and Defendant were married. [G.C.] later reveals Defendant touching over her chest and private area with her clothes on.  Even absent Williams rule or "intertwinement," there would have been a second chance for the state to convict Defendant on a serious charge even had Defendant's conspiracy theory been successful in a first trial.  Finally, the defense was that this was a conspiracy by the mother and the two girls to prevent a custody claim by Defendant as to [G.C.].  This defense covered motives for both victims.  It seems impossible to pursue this defense as to [S.M.] in isolation from [G.C.].  Frankly, this Court cannot discern a good strategic reason to have the trials severed given the risks and the theory of defense at the outset of the trial.

Doc. 11 Ex. O at 92-93.  As Respondent urges, this ruling, affirmed on appeal without

opinion, is entitled to AEDPA deference.

As referenced in the analysis of Ground 1, *supra* note 1, on the morning the trial

started, the prosecutor inquired about the pending motion to sever, and the following

transpired:

THE COURT: Okay.  Well, as far as the motion for severance, that has never been called up for a hearing, so it's been waived; correct?

MR. COMBS [prosecutor]: Well, I just wanted to make sure that that's what – the defendant would be in agreement with that.  The motion was filed.  I responded by filing a notice of Williams Rule evidence.  If a severance had been granted, it was my intention I would be presented basically the same testimony, some of it, under a Williams Rule or similar fact type of evidence presentation.

And so basically the same type of evidence would appear before two different juries, depending on which child was the focus of the particular case.  And I believe that after I filed that, the defense apparently made some decision not to bring up the motion to sever, but I wanted to make sure that that was part of the record.

THE COURT: I think the last – I thought it was on the record Monday at jury selection that that has been waived, correct?

MR. SMITH [defense counsel]: I do not intend to pursue the motion, Your Honor; yes, sir.

THE COURT: Okay. In other words, as a matter of strategy, you find it in the best interest to go ahead and have the cases tried – I mean, the two alleged incidents tried at the same time trial?

MR. SMITH: That's correct, Your Honor.

THE COURT: All right. Mr. Carman, I know your lawyer has discussed this matter of strategy with you. Do you feel that's in your best interest to do that?

THE DEFENDANT: Yes, I do.

THE COURT: Okay.

MR. SMITH: Your Honor, that brings me to a point [Defendant's condition] that I need to bring to the Court's attention at sidebar.

THE COURT: All right. Let me just ask him a couple of other questions though about this while I'm on it. Mr. Carman, so no one has – or, let me ask it this way. Has anyone forced, threatened or pressured you in any way to get you to make that decision with your lawyer?

THE DEFENDANT: No, sir.

THE COURT: Anybody promised anything to you to get you to make the decision?

THE DEFENDANT: No, sir.

THE COURT: Okay. And you're satisfied with your legal advice that you've received on that issue from your lawyer?

THE DEFENDANT: Yes, sir.

Doc. 11 Ex. D at 3-5. The record thus supports the state court's factual finding that

defense counsel made this decision as a matter of strategy. *See, e.g.*, Pardo, 587 F.3d

at 1103-04 (explaining district court correctly denied ground alleging IAC for

withdrawing motion to sever where record supported state court's factual finding that the severance decision was strategic).

The state court's adjudication of this ground was not based on an unreasonable determination of the facts in light of the evidence presented nor was it contrary to, or involve an unreasonable application of, clearly established federal law. As the state post-conviction trial court recognized, Carman has not shown deficient performance as required by Strickland. Defense counsel – with Carman's approval – decided not to pursue the severance motion, perhaps because of the prosecutor's notice of presenting the evidence regarding each victim as Williams Rule evidence in each case, if severance was granted. Even assuming deficient performance, Carman has not shown the outcome would have been different. This ground should be denied.

Ground 4: IAC – Failure to Object to Hearsay Statements of S.M.

In the fourth ground, Carman argues his trial counsel failed to raise a proper hearsay objection to the oral and written statements of S.M. admitted at the trial. Doc. 5 at 16. The state post-conviction trial court's determination that defense counsel was not ineffective is objectively unreasonable because it is contrary to the record and applicable Florida case law. Id.; see Carter v. State, 951 So. 2d 939 (Fla. 4th DCA 2007). S.M.'s four-page handwritten statement regarding the allegations against Carman was introduced into evidence and made a feature of closing argument. Doc. 5 at 17. S.M.'s statement was not admissible as a prior consistent statement pursuant to section 90.801(2), Florida Statutes, because Carman's defense was not that S.M.'s statement was recently fabricated; rather, his defense was that the allegations had

been fabricated from the beginning. Doc. 5 at 17. Carman asserts that S.M.'s statement was incredibly prejudicial because it included "countless references to Mr. Carman performing sexual acts on S.M., and repeatedly indicated that Mr. Carman called S.M. a 'dirty little Mexican.'" *Id*.

Carman asserts no physical evidence or independent eyewitness testimony corroborated S.M.'s testimony at trial, and Carman made no statement to police that incriminated him; thus, S.M.'s credibility was a crucial issue. *Id*. Carman asserts the only purpose served by S.M.'s written statement was to improperly bolster and corroborate her testimony. *Id*. at 17-18. Because the written statement was not admissible, trial counsel's failure to properly object constituted ineffective assistance. *Id*. at 18. Carman asserts that the state post-conviction trial court's determination that there was not IAC because the contents of the written statement were cumulative to the live testimony ignored Florida case law; indeed, that it was cumulative is the reason why its admission improperly bolstered S.M.'s testimony. *Id*. The state court's decision to summarily deny this claim was an unreasonable application of <u>Strickland</u>. *Id*.

Respondent adopts the facts and logic of the state post-conviction trial court order denying relief under Rule 3.850. Doc. 11 at 17; *see* Doc. 11 Ex. O at 92-93. The written statement was not admitted as substantive evidence; rather, it was admitted to demonstrate it was written by S.M. alone. Doc. 11 at 17. During direct examination of S.M., the prosecutor questioned S.M. about the written statement only in passing, as a series of events that had taken place, and the written pages of the statement itself was were not adduced into evidence. *Id*. at 17-18. On cross-examination, defense counsel

questioned S.M. about the statement in some detail, trying to determine whether anyone helped S.M. with it. *Id.* at 18. Then, on re-direct, the State questioned S.M. further about the written statement; the substance of the statement was not disclosed, only the context in which S.M. had written the statement. *Id*. A copy of the statement was then put into evidence, over defense counsel's objection based on relevance. *Id*. Thus, given these circumstances, the post-conviction trial court reasonably determined, as a fact, that the State's mention of the written statement was not for its substance, but to demonstrate that S.M. wrote the pages on her own, without material assistance, thereby rebutting the defense's conspiracy theory. *Id.* at 18-19. In addition, the post-conviction trial court properly determined, as a fact, that S.M. testified live about what Carman did to her, so the notes were cumulative. *Id.* at 19. Competent substantial evidence supports the post-conviction trial court's findings; therefore, they must be presumed correct. *Id*.; *see* 28 U.S.C. § 2254(e)(1). Given these findings, argues Respondent, the hearsay objection would have been meritless and overruled, and defense counsel was not deficient for not raising the objection. Doc. 11 at 19.

Respondent further asserts that, read fairly, the record shows defense counsel made a strategic decision to explore the handwritten statement, to attempt to demonstrate a conspiracy against Carman. Doc. 11 at 19. The handwritten notes were not read to the jury and evidently played no role in the prosecution's case. Doc. 11 at 20. Respondent maintains that Carman cannot now obtain habeas relief based on a defense strategy that was reasonable, but simply not effective. *Id.* at 19.

In reply, Carman asserts the record conclusively refutes Respondent's arguments. Doc. 18 at 4. During closing, the prosecutor read portions of S.M.'s written statement and made it a centerpiece of the argument for guilt. *Id.* The prosecutor urged the jury to review the statement and explained that the jury would not normally be permitted to view the statement, but could in this case because the defense had made an issue of it during trial, thereby further highlighting the statement's importance and improperly bolstering S.M.'s credibility. *Id.*; *see* Ex. F at 431-33. Under these circumstances, and based on applicable Florida law, Carman argues counsel's failure to object constituted IAC. Doc. 18 at 4. Because S.M.'s credibility was a central issue, counsel's deficient conduct severely prejudiced Carman. *Id.*

In denying this claim, the state post-conviction trial court made the following findings:

> 7. Contrary to Defendant's suggestion, [S.M.]'s written statement was not admitted as substantive evidence. It was admitted to demonstrate that it was written by [S.M.], and not her mother, as suggested by the defense at trial on cross. (Trial tr. 99-101; 113-117) This is because of the handwriting and the way it was written. This is also how the state and defense argued it in final arguments. (Trial tr. 431-33, state: 456-459, defense) Additionally, the content of the statement was cumulative. [S.M.] testified as to what happened and was cross-examined. Nothing in the statement adds to her testimony. Therefore, there is no deficiency of counsel and if so, there was no prejudice sufficient to undermine confidence in the verdict.

> 8. The conspiracy theory of defense on cross opened the door to the hearsay statements complained of because it became critical to establish who knew what, when, and told to whom, to rebut the conspiracy theory. The chronological sequence of reports made by [S.M.] were necessary to rebut the defense claim of improper motives by [S.M.], [G.C.], and their mother. The focus was not the content of statements. The content was cumulative to live testimony. (See trial transcript,

including opening and closing statements) Therefore, as to testimony
regarding the chronology of reporting of sex abuse by [S.M.] to Day,
Detective Long, and the CPT investigator, Mackey, there was no
deficiency of counsel, or, if so, there was no prejudice sufficient to
undermine confidence in the verdict.

Doc. 11 Ex. O at 93-94. This ruling, affirmed on appeal without opinion, is entitled to

AEDPA deference.

The record supports the state post-conviction trial court's findings. In particular,

during the direct examination of S.M., the following transpired when the prosecutor

asked about S.M. talking with the DCF investigator:

Q Was that the first person you had told about what had happened to
you?

A Yes.

Q How did you feel as you started – could you describe your emotional
state as you started talking about it?

A I started crying.

Q And did you start – did some of the stuff that you've been telling us
about start pouring out?

A Yes.

Q Before you started talking with her, had you any plans to tell anybody,
or anything like that, at that point in time? Did you – before you arrived
home, did you have any inkling at all that you would be talking about the
things that Mr. Carman had done to you?

A No.

Q So when you started talking to this lady, did all these events just start
coming out of your memory at that point?

A Yes.

Q Did you become pretty emotional about it at all?

A Yes.

Q After you talked to the lady for some period of time, were you of the understanding that they were going to want to talk with you again later with an interview by a specialist?

A That day?

Q Well, did you understand that you were going to have somebody talk with you the next day?

A Yes.

Q Since this is the first time you had – that it had all started coming out, did you do anything that night to try to sort through all of the things that had occurred?

A Yes.

Q What did you do?

A I wrote them down.  I wrote down the events on paper.

Q Just started writing about some of the things that had occurred to you?

A Yes.

Q Now these things that you've told us about, the things you wrote on the paper, I guess the next day you went to an interview and you told the lady about things you could remember?

A Yes.

Doc. 11 Ex. D at 92-94.  On cross-examination, defense counsel asked about the

written statement:

Q Okay.  Now, let me bring your attention to the handwritten statement that you authored on June 2, 2004.  Are you familiar with that document?

A Yes.

Q Okay. And, in fact, you did write out a long list of things that you said that Mr. Carman did to you; is that correct?

A Yes.

Q Okay. And you did that the evening of June 2nd?

A Yes.

Q How long did it take you to do that?

A I'm not sure.

Q Can you give me an estimation?

A No.

Q Well, is it fair to say that you were writing about events that had happened anywhere from eight to twelve years earlier?

A Can you repeat that?

Q [S.M.], the statement I'm talking about, are you familiar with what you wrote in that?

A Yes.

Q Okay. Those events, correct me if I'm wrong, occurred, according to you, between 1991 and 1996; is that correct?

A Yes.

Q Okay. So you would have been somewhere between five and ten years old?

A Yes.

Q So that would have been at least eight years earlier, and as far as twelve years back; is that right?

A Yes.

Q But you were able to write with such specificity, in one evening, all of those events?

A It wasn't all of the events.

Q Okay. But you've got four of these little handwritten pages done, didn't you?

A Yes.

Q Who was at home when you wrote this statement?

A My mother.

Q Who else?

A Family.

Q Who?

A My brothers, sister.

Q Did anyone help you author this document?

A No.

Q Did you mother help you remember anywhere you might have lived?

A Yes.

Q She did? So she did help you write some –

        MR. COMBS: Your Honor, I object, it's argumentative.

        THE COURT: She helped you with where you lived, is that what you're saying?

        THE WITNESS: Yes.

        THE COURT: Okay. Go ahead.

Q What else did she help you with in here?

A Nothing.

Q Absolutely nothing? Is that correct?

A Correct.

Q Okay. Now did your mother review this document before you took it to the Child Advocacy Center the next day?

A I don't know.

Q Did you give it to her?

A Yes.

Q Okay. So it left your hand and went to your mother; is that correct?

A Yes.

Q What did she do with it?

A Gave it to the advocate lady.

Q Okay. Did that advocate lady have a copy of this in front of her when she was asking you questions?

A For my interview?

Q Yes.

A Yes.

Q Okay. So ya'll gave this to the advocate lady, and while you are being interviewed, she had a copy of it in front of her; is that correct?

A I don't know if it was in front of her.

Q She had it?

A Yes.

Q [S.M.], I know Mr. Combs has asked you this before, but I want to be

perfectly clear, you never told a single, living person about any of the
things that you just described, before June 2, 2004; is that correct?

A Correct.

Q You never told [G.C.], sometime before that, that Mr. Carman had done
something to you?

A No.

*Id*. at 99-102.  On re-direct, the prosecutor again questioned S.M. about her written

statement, in follow-up to some questions asked by defense counsel, and offered the

statement into evidence:

Q.  Okay.  He asks a bunch of questions about a white car, and asked you
something about an accident, but you didn't remember anything about an
accident.  When these various things occurred to you, did you write down,
you know, May 1, 2003 – or, excuse me – 1993, this happened.  And May
20, 1993, this happened.  Did you ever write anything down like that that
you could refer to now and try to remember exactly what date things, or
how old you were or things like that?

A.  Yes.

Q Huh?

A Yes.

Q And what kind of things did you write down?

A It was a rough estimate actually, because I wasn't sure.  I would put like
'92 or '93.

Q Okay.  When did you write this down?

A When I wrote the four page.

Q So that's back then – we're talking about on the date that all this came
out, is that it?

A Yes.

Q Let me show this to you. Do you recognize this as being a xerox copy of what you wrote that time?

A Yes.

Q Okay. And at the time that you were writing that, were you trying to put down some of the various things that had occurred?

A Yes.

Q Okay. Did you put that stuff down as to that this happened on, you know, like May the 5th of '93, or anything like that?

A No.

Q Okay. Did you just try to, as best you could at that point, pull together these various events that occurred in your life?

A Yes.

Q When you're asked the question, and you say that this was ''93, is that just your best recollection at the time when you wrote it down in 2004?

A Yes.

Q Okay. I believe you said that you were asked a question, did your mom help you write it down. You responded something about you asked her some questions about where you lived, and at what order of things you lived in; is that right?

A Yes.

Q Okay. From the time your mom got married, until the time of the divorce, ya'll lived in a few different places; is that correct?

A Yes.

Q Okay. Did you have somewhat of a difficulty recalling exactly the order of exactly where you lived at what time?

A No.

Q Did you – what did you need her assistance on?

A I just wanted to know how long we lived in the brick house.

Q Okay.  You remember living in the brick house?

A Yes.

Q That was the one in Tallahassee?

A Yes.

Q But you didn't remember how long that had been?

A Yes.

Q Okay.  So she gave you some input as to how long you physically lived in that residence before you moved back to Quincy?

A Yes.

Q I see.  What about some of the things you put in there, you wrote down about actions that occur – acts that occurred to you by Mr. Carman, did your mom suggest to you that gee, you need to put this in there, or, gee, you need to – did she help you at all in phraseology, or coming up with any of the events, or anything like that?

A No.

Q Between the time that you talked to the lady at the Division of Family Services, the one that came to you and talked to you at your home, and you first told her all these things, until the time you sat down and you wrote out those details in your handwriting, did you sit down with anybody else to go over, or did you and your mom talk about – did you sit there and tell her all this stuff that had occurred and then write it down, or what communication was there between you and your mom between the time you first told the DCF lady and the time you started writing, what kind of communication?

A Like, I told her a couple of things that he had done.  But then I started writing this down, because she said it will be easier for me to write it, that way I could remember.

Q You told her some of the stuff that happened?

A Yes.

Q Did you sit down and try to go through with her everything that happened?

A No.

Q Writing it down, was that an easier way to kind of explain to your mom and everything what had happened?

A Yes.

Q And after you wrote it down, you gave it to her?

A Yes.

Q Okay. In looking at that Xerox copy, does that appear to be an accurate copy of what you wrote?

A Yes.

Q Okay. And to your knowledge, you gave this to your mom, and then when you went the next day for your interview, the lady there that was interviewing you had the advantage of looking down and seeing what you had written here?

A Yes.

Q Okay. If I could have this marked as State's Exhibit No. 1?

      THE COURT: All right.

      MR. COMBS: I would offer it into evidence.

      THE COURT: Any objection?

      MR. SMITH: Object on the basis of relevance, Your Honor.

      THE COURT: Overruled.

*Id*. at 113-17.

The record thus supports the state post-conviction trial courts findings that S.M.'s written statement was admitted to demonstrate that it was written by S.M., and not her mother, as suggested by the defense at trial on cross. *See id.* at 431 (closing argument of prosecutor explaining why statement is in evidence: "Now normally, the State would not be allowed to put this into evidence. This is what you might call a prior consistent statement . . . . But the defense in this case has made an issue of this written statement, gave it some characterizations, described it as some detailed, structured writing influenced by the mother . . . ."). Defense counsel questioned S.M. extensively about the statement and, in closing argument, urged the jury to review the statement and compare it to an injunction form S.M.'s mother had filled out – in support of the defense theory that this was a conspiracy by S.M.'s mother. *Id*. at 456 (closing argument of defense counsel: "Is it reasonable to believe that the document you're going to take back to the witness room with you was created without any input of [S.M.]'s mother? Read the language. Compare it to the injunction form that Ms. Day admits to filling out. Ask yourself, does this kind of sound the same? Do they write the same?"). Further, as the state post-conviction trial court found, the content of S.M.'s written statement was cumulative, as S.M. testified at trial as to what happened and was cross-examined.

The state court's adjudication of this ground was not contrary to, and did not involve an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Carman has not shown deficient performance as required by <u>Strickland</u>, nor has

Carman shown the outcome would have been different.  This ground should be denied.

<u>Ground 5: IAC – Failure to Object to Prosecutor's Conduct</u>

In this ground, Carman asserts (a) the prosecutor argued facts not in evidence,

(b) improperly reduced the State's burden of proof, (c) repeatedly stated his personal

opinion of the evidence presented, and (d) improperly emphasized a single piece of

evidence.  Doc. 5 at 18.  The state post-conviction trial court denied this ground, making

the following findings:

> 9.  The allegations . . . relative to prosecutorial statements cannot
> be fairly addressed piecemeal.  Simply stated, the arguments and fair
> inferences from evidence can only be discerned by a reading of the entire
> trial, from opening statements through the closing arguments.  This Court
> has performed this task.  Nothing was said by the prosecutor, either alone
> or cumulatively, which undermined the basic fairness of these
> proceedings or confidence in the verdict.  (Trial tr. 34-493) The Court
> would note that in closing it is proper for attorneys to say "I submit . . . ."

Doc. 11 Ex. O at 94.  For ease of analysis, each assertion is separately addressed

below.

<u>(a) Facts Not in Evidence</u>

Carman argues that the prosecutor, in opening statement and closing argument,

argued the State could have charged Carman with numerous counts of sexual abuse

against S.M., but only one count was necessary; this improperly suggested that

Carman was guilty of countless offenses.  *Id*. at 19.  That the State may have been able

to charge him with additional offenses was completely irrelevant to the offenses for

which he was actually charged.  *Id*.

Respondent refers to the pages of the trial transcript containing the prosecutor's statements in opening and closing concerning the charge in the case. Doc. 11 at 21; *see* Doc. 11 Ex. D at 36 and Ex. F at 443. Respondent describes the count charged involving S.M., and S.M.'s testimony. Doc. 11 at 21-22. Respondent also describes the counts charged involving victim G.C., and G.C.'s testimony. *Id*. at 22. Respondent agrees the prosecutor's comments during opening and closing, "in retrospect, cause some concern" because "they do imply a lot of crimes were committed but not charged." *Id*. Respondent explains, however, that all three counts alleged that Carman sexually battered S.M. or lewdly touched G.C. "on various occasions." *Id*. at 22-23; *see* Ex. A at 17-18. Both victims testified to numerous incidents. Therefore, Respondent concludes, Carman was not deprived of a fair trial by these remarks, as the state post-conviction trial court found. Doc. 11 at 23.

Respondent further asserts that, on the counts involving G.C., the jury found Carman guilty of the lesser offenses of battery. *Id*. at 23; *see* Ex. A at 48-49. Respondent argues that these verdicts "show the jury was not swayed by any impropriety in the prosecutor's remarks that more offenses could have been charged." Doc. 11 at 23. Carman cannot show prejudice due to any deficiency in counsel's failure to object. *Id*. Respondent concludes that the post-conviction trial court's decision that nothing undermined the basic fairness of the proceedings or confidence in the verdict was not an unreasonable determination of the facts or an unreasonable application of Strickland. *Id*.

In reply, Carman does not specifically address this ground, relying on the arguments he raised in his petition. Doc. 18 at 5. Accordingly, presumably the statements identified by Respondent are the ones with which Carman takes issue.

As indicated above, Respondent identified two instances – the first a statement by the prosecutor in opening and the second a statement by the prosecutor in closing argument:

> (1) "I suppose you will probably get the impression, after hearing all the evidence, that we could file a basket load of different charges, but we didn't, because it's not that necessary." Doc. 11 Ex. D at 36.

> (2) "In this type of situation, it was an event, a crime that, you know, we could throw in hundreds of counts, or whatever we wanted to, but it was simply not necessary." *Id*. Ex. F at 443.

Doc. 11 at 21. Given the many instances to which S.M. and G.C. testified, these comments appear as an attempt to explain to the jury why the State charged Carman with only three counts. As the post-conviction trial court found, reading the record of the trial, these comments do not undermine the fairness of the trial or the confidence in the verdict. That court's conclusion, affirmed without opinion by the First DCA, was not an unreasonable determination of the facts or application of Strickland.

## (b) Reduction of State's Burden of Proof

Carman relies on the same statements by the prosecutor in support of his argument that the prosecutor improperly reduced the State's burden of proof. Doc. 5 at 19. Respondent asserts that any impropriety concerning those statements did not go to the State's obligation to adduce proof beyond a reasonable doubt. Doc. 11 at 23.

Respondent also points out that, after the closing arguments, the trial court instructed the jury that the State had to prove each offense beyond a reasonable doubt. *Id*.

As Respondent asserts, these comments, quoted above in (a), did not reduce the State's burden of proof. The prosecution had the burden to prove each of the charged offenses beyond a reasonable doubt, and the trial court so instructed the jury. Doc. 11 Ex. F at 493-97, 500-01, 504-05. The trial court also instructed the jury to consider the evidence presented as to each of the three separate crimes. *Id*. at 504-05. Indeed, as to the two offenses involving victim G.C., the jury found Carman guilty of the lesser included offenses of battery – thus indicating that the jury followed the judge's instructions that "if you decide that the main accusation has not been proved beyond a reasonable doubt . . . , you will next need to decide if the defendant is guilty of any lesser included crime." *Id*. at 497; *see id.* at 499. Carman has not shown deficient performance by trial counsel or prejudice.

### (c) Personal Opinion of Evidence

Carman asserts the prosecutor improperly stated, in opening, that G.C. had disclosed instances of fondling to "us," thus implying he was part of law enforcement and vouching for the credibility of the allegations made by G.C. *Id*. During closing, the prosecutor repeatedly used phrases such as "I submit to you" and "I would submit" when describing evidence admitted at trial and, on one occasion, he stated that testimony "did strike me a little bit." *Id*.

Respondent quotes the portion of the trial transcript containing the prosecutor's comment:

As to Counts 2 and 3, they both charge lewd molestation . . . . It's a type of offense that we commonly refer to sometimes as a fondling. That is what she disclosed to us.

Doc. 11 at 24 (quoting Ex. D at 40). Respondent asserts this remark occurred early in the trial, "is trivial, and could not have caused prejudice." *Id*. In addition, the prosecutor's occasional use of "I submit" was proper under state law and did not deprive Carman of a fair trial. *Id*. at 24-25.

In reply, Carman does not specifically address this ground, relying on the arguments he raised in his petition. Doc. 18 at 5. Accordingly, presumably the statements identified by Respondent are the ones with which Carman takes issue.

As Respondent asserts, the prosecutor's comment during opening statement appears trivial and could not have prejudiced Carman. *See* Doc. 11 Ex. D at 40 ("As to Counts 2 and 3, they both charge lewd molestation . . . . It's a type of offense that we commonly refer to sometimes as a fondling. That is what she disclosed to us."). As the post-conviction trial court found, reading the record of the trial, these comments do not undermine the fairness of the trial or the confidence in the verdict. That court also noted that, in closing arguments, it is not improper for attorneys to use the phrase "I submit." *See, e.g.*, Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) ("Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn and counsel is allowed to advance all legitimate arguments." (citations omitted)); State v. Lewis, 543 So. 2d 760, 768 (Fla. 2d DCA 1989) ("The prosecutor prefaced statements by 'I submit' and in once instance, in commenting on Lewis's varying accounts of his actions at the crime scene, said, 'I can't believe that.' These comments were not prejudicial."). Further, that

court's conclusion, affirmed without opinion by the First DCA, was not contrary to, and did not constitute an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

### (d) Improper Emphasis on Written Statement of S.M.

Carman also asserts that, during closing, the prosecutor discussed the reason S.M.'s written statement was admissible at trial, and this improperly placed an undue emphasis on that piece of evidence. *Id*. at 20. Carman maintains there was no reason the jury needed to know the alleged legal basis for the statement's admissibility. *Id*.

Respondent incorporates the argument from Ground 4, and maintains that S.M.'s written statement was properly adduced and relevant to rebut Carman's claim of conspiracy. Doc. 11 at 25. Respondent asserts the prosecutor was entitled to emphasize that evidence to the extent he felt necessary, and at no time was the statement portrayed as more significant than the same testimony given by S.M. at trial. *Id*. Defense counsel was not deficient for not objecting. *Id*. The evidence was properly admitted and properly mentioned in closing; that Carman considers it unfavorable does not constitute cognizable "prejudice" in a habeas case. *Id*.

Similar to the reasons given in the analysis of Ground 4, the claim here also fails. Both the prosecutor and defense counsel referred to S.M.'s written statement and emphasized the aspects thereof that worked the best with their respective theories. Carman has not shown deficient performance by counsel or prejudice. The state post-conviction trial court's decision denying this claim was not contrary to or an

unreasonable application of federal law.  *See, e.g.*, <u>Chandler v. Crosby</u>, 454 F. Supp.

2d 1137, 1178-79 (M.D. Fla. 2006) (analyzing IAC claim for failure to object to

prosecutor's statements during closing and explaining: "To amount to a constitutional

violation, the prosecutor's remarks must have 'so infected the trial with unfairness as to

make the resulting conviction a denial of due process.' . . . Federal case law regarding

closing statements is the same as Florida law." (citations omitted)).

<u>Ground 6: IAC – Failure to Object to Emphasis on Racial Epithet</u>

In this ground, Carman argues the prosecutor improperly emphasized a racial

epithet Carman allegedly used to describe S.M.  Doc. 5 at 20.  Carman asserts defense

counsel's failure to object to this constituted IAC.  *Id*.  Florida courts have consistently

held that appeals to racial or ethnic bias are inappropriate.  *Id*.; *see, e.g.*, <u>Wallace v.

State</u>, 768 So. 2d 1247 (Fla. 1st DCA 2000).  Here, the prosecutor repeatedly

emphasized that S.M. claimed that Carman referred to her as a "dirty little Mexican"

when he was attempting to convince her not to report his alleged sexual misconduct.

Doc. 5 at 21.  Carman indicates this racial epithet was uttered eight times during the

trial:  once during the testimony of S.M., twice during the prosecutor's cross-

examination of Carman, and he prosecutor mentioned it five times during opening and

closing.  *Id*.  The prosecutor's repeated reference to the racial epithet constituted an

inappropriate appeal to the emotion of the jury and an invitation to convict Carman for a

reason other than actual proof of his guilt.  *Id*.  Carman maintains that had defense

counsel objected, there is a reasonable probability the outcome of the trial would have

been different.  *Id*.  The case was a classic credibility contest, and the State did not

present any evidence that corroborated the allegations made by either S.M. or G.C., which allegations Carman denied. *Id*. The state post-conviction trial court's conclusion that each of the references was appropriate is not supported by the record. *Id*. That court's conclusion that trial counsel was not ineffective for failing to object was an unreasonable application of Strickland. *Id*. at 21-22.

Respondent asserts this ground is similar to Ground 5. Doc. 11 at 25. Respondent objects "to Carman's deliberate understatement" and maintains that Carman used the term "dirty little Mexican" to intimidate S.M., as found by the post-conviction trial court. *Id.* at 26; *see* Doc. 11 Ex. O at 94. Respondent asserts Carman's use of the phrase was relevant in substance and to refute Carman's claim of conspiracy, as S.M. testified he said it to intimidate her into not telling. Doc. 11 at 26. Respondent adopts the post-conviction trial court's factual findings and rationale. *Id.* Respondent asserts that any objection by defense counsel would have been meritless and overruled, while also emphasizing the phrase to the jury. *Id.* at 26-27. Counsel did not perform deficiently and Carman did not suffer cognizable prejudice by having his own words to one victim used against him at trial. *Id.* at 27.

In denying this claim, the state post-conviction trial court made the following findings:

> 10. In sum the context of each reference to "dirty little Mexican" was proper. The first reference in opening was what the evidence showed Defendant said and did to [S.M.] when she was a child to prevent her from telling. (Trial Tr. 43) The second reference in opening concerns what [S.M.] told Ms. Tercier, from DCF, as to why [S.M.] didn't tell anyone, either for herself or to protect [G.C.], because, unlike [G.C.], . . . [S.M.] was only the "dirty little Mexican." (Trial Tr. 51) The next reference is

[S.M.]'s trial testimony that Defendant told her no one would believe her because she was only "a dirty little Mexican." This evidence was relevant to explain why this young child never told about the abuse she suffered for years. (Trial Tr. 77) The next reference is the question to Defendant himself, who denied ever calling [S.M.] "a dirty little Mexican." This was a proper cross examination question of Defendant, who claimed the allegations were a conspiracy, and that he never did or said anything like that [S.M.] claimed. (Trial Tr. 405) The next reference is pointing out these words were [S.M.]'s handwriting in her statement about why she felt she deserved this treatment. She felt trashy and no one would believe her. (Trial tr. 432) In summary, the state said nothing inappropriate that was not supported by evidence and fair argument. The state never used the term to imply Defendant was a racist; rather it was part of what Defendant said to manipulate [S.M.] to remaining silent when she was a young child victim.

Doc. 11 Ex. O at 94. The record supports the state post-conviction trial court's findings.

In particular, during the opening statement, the prosecutor referred to the phrase "dirty little Mexican girl" in explaining why S.M. had not told anyone about the incidents when they occurred:

> During this time, he [Carman] was telling her that she better not tell anybody, that nobody would believe her because she was a dirty little Mexican girl, and that if she ever said anything, he was going to hurt her mom and her brother. And she didn't. She didn't say anything. . . .

Doc. 11 Ex. D. at 42-43. The prosecutor again used the phrase again later in the opening statement, when relating what S.M. had told the DCF investigator:

> It just starts rolling out of her. All these events that had occurred to her, just start coming out as she's sitting there talking to Ms. Tercier. She starts to blame herself, that she had not said anything, or did anything, for anything that could have occurred to . . . [G.C.].
>
> She indicates that he had told her that he wouldn't mess with [G.C.] . . . . That he was going to mess with her [S.M.] because she was a dirty little Mexican. And she had not – she had believed that that was basically going to e the situation with . . . [G.C.].

*Id*. at 50-51. Next, during direct examination, the prosecutor asks S.M. about Carman's

use of the phrase:

> Q Okay. These events that occur, when they occurred, did you say anything at all to your mom, or to your grandmother, or anybody like that?
>
> A No.
>
> Q Did Mr. Carman say some things to you when he was touching you and doing these things?
>
> A Yes.
>
> Q What kind of things did he say to you?
>
> A He would call me a dirty little Mexican and stuff like that.
>
> Q Did he talk to you at all about not telling anybody anything?
>
> A Yes.
>
> Q What did he tell you?
>
> A Don't tell anybody, because it would be my fault, and no one would believe me because I was a dirty little Mexican. And that if I were to tell anybody, he would hurt my mother and my brother and it would just be my fault.

*Id*. at 76-77. During the prosecutor's cross-examination of Carman, he asked Carman

about the use of the phrase:

> Q And from your testimony, you had this good relationship with both of these children; correct?
>
> A Yes.
>
> Q Okay. The times that your relationship with Sofia, isn't it true that at times you would call her a dirty little Mexican?
>
> A I would never call anybody that. I don't use racial slurs.

Q Isn't it true that when you would call her a dirty little Mexican, you would tell her that no one would believe her, things of this nature?

A Absolutely not. I would never say anything like that. I never had any reason to say anything like that.

*Id*. Ex. F. at 405-06. Finally, during closing argument, the prosecutor uses the phrase in describing S.M.'s written statement:

Different times, she's back and forth as things, I would submit to you, are just coming out. She talks in here very early in, as she's writing down what's coming out, she talks about, you know, he would make me give him oral sex. I didn't like it. But he said that I'm a dirty little Mexican, and that's what I deserve. And that's what – and she kind of writes it in almost capital letters here, dirty little Mexican girls do.

He used to tell me that I do not have a real father, and that no one would ever love me because I'm a dirty little Mexican. He told me if I ever tried to tell anybody, he would hurt [my brother], mom and me. He also said it was my fault because I'm trashy. And if I told, no one would believe me because I'm Mexican and people would think I'm just a nasty girl.

From the testimony, I would submit to you, you can gather we're dealing here with more than some physical and sexual abuse of a child, there's psychological abuse of this child, which may be, you know, quite indicative then of her difficulty ever in expressing some of this later on.

*Id*. at 432-33. In denying this claim, the state post-conviction trial court reasonably concluded, after reviewing the record, that "the state said nothing inappropriate that was not supported by evidence and fair argument" and "[t]he state never used the term to imply Defendant was a racist; rather it was part of what Defendant said to manipulate [S.M.] to remaining silent when she was a young child victim." Doc. 11 Ex. O at 94; *cf*. Wallace, 768 So. 2d at 1250 ("Florida courts have consistently recognized that it is

improper to interject a racial or ethnic reference that is not relevant to an issue in the case.").

The state post-conviction court's adjudication of this ground was not contrary to, and did not involve an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Carman has not shown deficient performance as required by Strickland or that the outcome would have been different. This ground should be denied.

Ground 7: IAC – Cumulative Effect of Trial Counsel's Errors

In this final ground, Carman argues that even if the Court concludes that none of the above claims warrants federal habeas relief standing alone, then the Court should conclude that the cumulative effect of trial counsel's deficient performance deprived Carman of his right to a fair trial. Doc. 5 at 22. This is Carman's entire argument on this ground. *Id.*

Respondent argues this ground fails to state a cognizable claim for habeas relief. Doc. 11 at 27. Respondent points out this ground consists only of a conclusory statement. *Id.* Further, although Carman's Rule 3.850 motion included a claim of cumulative error, that claim was not raised in the appeal from the denial of that motion. *Id.*; *see* Exs. N at 26 and Q. Therefore, this ground is not exhausted and is procedurally barred. Doc. 11 at 28. Finally, Respondent points out that, absent an individual claim of error warranting relief, there is no habeas "cause of action" for cumulative error. *Id.; see* Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 564-65 (11th Cir. 2009).

The state post-conviction trial court denied the claim alleging the cumulative effect of trial counsel's deficient performance, finding, "[t]here were no errors of trial counsel, and therefore no cumulative errors." Doc. 11 Ex. O at 95. As Respondent indicates, Carman did not challenge this in his appeal of this order to the First DCA. Therefore, this ground was not exhausted.

On the merits, the Court should deny this ground. Notably, the Eleventh Circuit has rejected a similar "cumulative error" argument in a § 2254 proceeding. *See* Forrest v. Fla. Dep't of Corr., 342 F. App'x 560 (11th Cir. 2009) (explaining that "[t]he Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim" but "the Supreme Court has held, in the context of an ineffective assistance of counsel claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt" (quoting United States v. Cronic, 466 U.S. 648, 659 n.26 (1984))). Here, as demonstrated by the above analysis, the state post-conviction trial court's adjudication of Carman's IAC claims did not involve an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Carman has not demonstrated his trial counsel performed deficiently, nor has he demonstrated the outcome would have been different.

## Conclusion

Based on the foregoing, Petitioner is not entitled to federal habeas relief. The amended § 2254 petition (Doc. 5) should be denied.

Case No. 4:10cv255-RH/CAS

## **Certificate of Appealability**

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## **Recommendation**

It is therefore respectfully **RECOMMENDED** that the Court **DENY** Petitioner's § 2254 petition (Doc. 1). It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

Case No. 4:10cv255-RH/CAS

**IN CHAMBERS** at Tallahassee, Florida, on May 7, 2013.

S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.